# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL ROBERT MARCHNER, JR., derivatively on behalf of B. RILEY FINANCIAL, INC., a Delaware Corporation, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2025-0164-LWW |
| BRYANT R. RILEY, ROBERT L. ANTIN, TAMARA "TAMMY" BRANDT, ROBERT D. D'AGOSTINO, THOMAS J. KELLEHER, RENEÉ E. LABRAN, RANDALL E. PAULSON, MICHAEL J. SHELDON, and MIRIAM "MIMI" K. WALTERS, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| B. RILEY FINANCIAL, INC., Nominal Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: December 22, 2025
Date Decided: March 30, 2025

Carmella P. Keener, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Robert C. Finkel, Adam J. Blander, Justyn J. Millamena, WOLF POPPER LLC, New York, New York; *Counsel for Plaintiff*

Raymond J. DiCamillo, Sandy Xu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Adam S. Paris, Diane L. McGimsey, Sheeva L. Nesva, Annabelle A. Spezia-Lindner, Tyler J. Andrews, SULLIVAN & CROMWELL LLP, Los Angeles, California; *Counsel for Nominal Defendant B. Riley Financial, Inc. and Defendants Bryant R. Riley and Thomas J. Kelleher*

Garrett B. Moritz, R. Garrett Rice, Kevin A. Rudolph, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Craig Varnen, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; Monica K. Loseman, GIBSON, DUNN & CRUTCHER LLP, Denver, Colorado; H. Chase Weidner, GIBSON, DUNN & CRUTCHER LLP, New York, New York; *Counsel for Defendants Robert D. D'Agostino, Robert L. Antin, Tamara Brandt, Reneé E. LaBran, Randall E. Paulson, Michael J. Sheldon, and Miriam K. Walters*

**WILL, Vice Chancellor**

This case presents a hindsight critique of a business decision gone awry. The plaintiff seeks to recast an unfortunate investment as a breach of the duty of loyalty. He does not succeed.

In 2023, B. Riley Financial, Inc. invested hundreds of millions of dollars to facilitate the take-private acquisition of Franchise Group, Inc., an entity led by Brian Kahn, a friend of B. Riley's founder Bryant Riley. Months after the transaction closed, Kahn was implicated in a massive securities fraud. The fallout was financially devastating for B. Riley, which took significant write-downs on its Franchise Group-related investments.

Yet the alleged fraud did not occur at B. Riley. It did not even occur at Franchise Group. The misconduct took place at Prophecy Asset Management LP— a third-party entity that Kahn was affiliated with, but B. Riley is not. B. Riley's board is nevertheless accused of ignoring "red flags" about Kahn and breaching its fiduciary duties by approving the take-private and related loans.

The plaintiff's theory stretches *Caremark* well beyond its limits. To state an oversight claim, a plaintiff must plead that directors consciously disregarded evidence of non-compliance with positive law within the corporation. The plaintiff here essentially complains that the board did not uncover fraud at an outside company before the federal government did. Nothing suggests that the board knew about the wrongdoing at Prophecy at the time of the Franchise Group take-private.

1

Imperfect diligence on an investment that later sours is a matter of business risk, not bad faith.

Unable to show that a majority of the board faces a substantial likelihood of liability, the plaintiff attempts to disqualify the outside directors by arguing they are beholden to Bryant Riley. He theorizes that the directors intentionally violated their fiduciary duties simply to help Riley protect Kahn. In support, he relies almost exclusively on ordinary course director compensation, stale business and personal ties, and generic social relationships. These thin allegations are insufficient to overcome the heavy presumption of director independence.

Because the plaintiff has failed to plead that a majority of the board is interested or lacks independence, demand is not excused. The defendants' motions to dismiss under Court of Chancery Rule 23.1 are granted.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the plaintiff's Verified Stockholder Derivative Complaint (the "Complaint") and the documents it incorporates by reference, or are subject to judicial notice.[1]

---

[1] Verified S'holder Deriv. Compl. (Dkt. 1) ("Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint." (citation omitted)); *In re Books–A–Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) ("This court may consider the Proxy Statement to establish what was disclosed to stockholders and other

2

## A.    B. Riley and Its Board

Nominal defendant B. Riley Financial, Inc. ("B. Riley" or the "Company") is a Delaware corporation headquartered in Los Angeles, California.[2]  Founded in 1997, B. Riley provides investment banking, wealth management, and advisory services to public and private companies, financial sponsors, and financial institutions.[3]

The Company has a nine-member board of directors (the "Board").[4]  During the relevant period, the Board included two B. Riley officers—Co-Chief Executive Officers Bryant Riley ("Riley") and Thomas Kelleher—and seven "outside directors."[5]  The outside directors were Robert Antin, Tammy Brandt, Robert

---

facts that are not subject to reasonable dispute." (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

Exhibits to the Transmittal Affidavit of Sandy Xu, Esq. in Support of the Nominal Defendant's and Officer Defendants' Opening Brief in Support of their Motion to Dismiss (Dkt. 20) and to the Transmittal Affidavit of Kevin A. Rudolph in Connection with the Outside Director Defendants' Opening Brief in Support of their Motion to Dismiss (Dkt. 21) are cited as "Nominal Def.'s and Officer Defs.' Ex. __" and "Outside Defs.' Ex. __," respectively.  Exhibits lacking internal pagination are cited by the last three digits of their Bates stamps.  Certain exhibits were produced in response to a pre-suit books and records demand pursuant to confidentiality agreements containing incorporation by reference provisions. *Pettry ex rel. FedEx Corp. v. Smith*, 2021 WL 2644475, at *8 n.90 (Del. Ch. June 28, 2021) (explaining that "Section 220 documents[] [were] incorporated by reference into the Complaint to the extent [they] directly dispute[d] [p]laintiff's conclusory assertion[s]"), *aff'd*, 273 A.2d 750 (Del. 2022).

[2] Compl. ¶ 48.

[3] *Id.* ¶ 1.

[4] *Id.* ¶ 29.

[5] *Id.* ¶¶ 49, 57.  Bryant Riley is also the Chairman of the Company. *Id.*

D'Agostino, Reneé LaBran, Randall Paulson, Michael Sheldon, and Miriam Walters.[6]

### B. B. Riley's Relationship with FRG

B. Riley had a lucrative, years-long relationship with Franchise Group, Inc. ("FRG")—a publicly-traded operator of franchise businesses, including Sylvan Learning, The Vitamin Shoppe, and Pet Supplies Plus.[7] FRG was founded in August 2018 by Brian Kahn, a private equity investor.[8]

From 2018 to 2023, B. Riley advised on or financed several FRG transactions, including underwriting FRG's 2018 initial public offering and advising Kahn's firm, Vintage Capital Management LLC, on portfolio acquisitions.[9] B. Riley also made significant loans to Kahn and his affiliates.[10]

In 2021, B. Riley assisted with FRG's acquisition of W.S. Badcock Corporation, a home furnishings company.[11] B. Riley and its affiliates acquired

---

[6] *Id.* ¶¶ 58-64.

[7] Nominal Def.'s and Officer Defs.' Ex. 4 (Franchise Gp., Inc., Form 10-K) 7; Compl. ¶¶ 70, 73.

[8] Compl. ¶ 73. Vintage Capital Management LLC, a private equity firm founded by Kahn, merged FRG's predecessor with Liberty Tax, Inc., a publicly traded company. *Id.*

[9] *Id.* ¶¶ 73, 77.

[10] Nominal Def.'s and Officer Defs.' Ex. 2 (Form 10-K, B. Riley Fin., Inc., for fiscal year ending December 31, 2023) ("B. Riley 2023 Form 10-K") 5, 160; *see also* Compl. ¶¶ 219, 224 (alleging the loans were thinly collateralized).

[11] Compl. ¶ 82.

Badcock's consumer credit receivables.[12]  By early 2023, B. Riley representatives told FRG that "[B. Riley] would prefer to explore the acquisition of all of the outstanding equity of FRG, rather than expose itself to continued balance sheet risk without any equity or similar upside."[13]

### C.    The FRG Take-Private

In March 2023, B. Riley proposed taking FRG private at $30 per share.[14]  FRG established a special committee to evaluate the offer, and the committee retained outside legal counsel and a financial advisor.[15]

During due diligence in April 2023, FRG's management and advisors updated FRG's financial projections to reflect significant economic headwinds.[16] Acknowledging these issues, B. Riley refused to increase its $30 per share offer but proceeded with the transaction.[17]  It agreed that Kahn would control the surviving company.[18]

---

[12] *Id.* ¶¶ 86-87.

[13] *Id.* ¶ 104 (citing Nominal Def.'s and Officer Defs.' Ex. 6 (Schedule 14A, Definitive Proxy Statement, Franchise Gp., Inc.) ("FRG Proxy") 21).

[14] *Id.* ¶ 109.

[15] *Id.* ¶¶ 119-21.

[16] *Id.* ¶¶ 121-22.

[17] *Id.* ¶¶ 125-27.

[18] *Id.* ¶ 130.

On May 5, FRG uploaded updated projections to a virtual data room that was shared with B. Riley. The projections reflected a nearly 30% decrease in FRG's 2023 EBITDA and a "significant decline" in operating performance.[19]

Three days later, on May 8, B. Riley's Board met to consider the take-private.[20] Co-CEO Riley gave a presentation based on stale January 2023 FRG projections, which allegedly concealed FRG's deteriorating financial condition.[21] Director Paulson—who had participated in the Company's deal team meetings with FRG—did not mention the May 5 projections.[22] The Board meeting lasted just over an hour, and no formal vote was taken.[23] The next day, on May 9, the Board approved B. Riley's participation in the transaction by unanimous written consent.[24]

On May 10, FRG announced the $2.6 billion take-private transaction in which B. Riley and a private equity partner would acquire 64% of FRG's outstanding common stock at $30 per share.[25] The same day, FRG disclosed disappointing first-

---

[19] *Id.* ¶¶ 131, 133-34.

[20] Compl. ¶¶ 135-36; Nominal Def.'s and Officer Defs.' Ex. 7 (Minutes of the Meeting of the Board of Directors of B. Riley Fin., Inc., dated May 8, 2023).

[21] Compl. ¶¶ 136-42.

[22] *Id.* ¶¶ 164, 166; *see id.* ¶ 169 (alleging that Paulson "presumptively had knowledge that [the presentation] was stale and misleading").

[23] *Id.* ¶ 156.

[24] *Id.* ¶ 157.

[25] *Id.* ¶¶ 172-73.

quarter operating results and withdrew its forecast for 2023.[26] The announcements were allegedly coordinated to prevent FRG's stock price from "plummet[ing]."[27]

The take-private closed in August 2023.[28] B. Riley committed $216.5 million in equity to FRG's new parent entity.[29] Simultaneous with closing, B. Riley and Vintage rolled up pre-existing loans into a single note with an aggregate principal amount of approximately $201 million, bearing interest at 12% annually and maturing on December 31, 2027.[30]

### D. Post-Closing Headwinds and Disclosures

Although FRG ceased reporting as a public company after the take-private, it retained public debt.[31] Rating agencies soon downgraded FRG's debt due to its poor operating results and additional debt incurred from the transaction.[32] The plaintiff alleges that these downgrades "dramatic[ally] impact[ed]" the value of B. Riley common stock and were a "red flag" that should have made Board members rethink the take-private.[33]

---

[26] *Id.* ¶¶ 176-79, 187.

[27] *Id.* ¶ 188.

[28] *Id.* ¶ 201.

[29] *Id.* ¶ 204.

[30] B. Riley 2023 Form 10-K at 106.

[31] Compl. ¶ 209.

[32] *Id.* ¶ 210.

[33] *Id.* ¶¶ 211, 213-15, 218.

In December 2023, B. Riley first publicly disclosed its $200.5 million loan to Vintage.[34] That same month, home goods retailer Conn's Inc. acquired Badcock from FRG for preferred stock valued at $70 million.[35] To finance the acquisition, B. Riley made a $108 million term loan to Conn's.[36] This further investment was wiped out when Conn's filed for bankruptcy in July 2024.[37]

### E.  Kahn's Fraud and B. Riley's Fallout

On November 2, 2023, John Hughes—the co-founder of Prophecy Asset Management LP—pled guilty to a criminal conspiracy charge for hiding losses of $294 million from investors.[38] The Securities and Exchange Commission (SEC) filed a parallel complaint.[39] Kahn was soon described as a co-conspirator by the media.[40]

---

[34] *Id.* ¶ 219.

[35] *Id.* ¶ 286.

[36] Nominal Def.'s and Officer Defs.' Ex. 9 (B. Riley Fin. Investor Overview, dated Dec. 13, 2023) 63.

[37] Compl. ¶ 292.

[38] *Id.* ¶¶ 232-33.

[39] *Id.* ¶ 238; *see SEC v. Hughes*, No. 3:23-cv-21816 (D.N.J. Nov. 2, 2023); *see also Landesbank Baden-Wurttemberg v. Walton Seattle Mezz Hldgs. VI-B, L.L.C.*, 2013 WL 1286192, at *5 n.8 (Del. Ch. Apr. 1, 2013) (explaining that the court "may take judicial notice of publicly available judicial filings in a related action pending in another jurisdiction").

[40] Compl. ¶ 233.

The SEC's complaint alleged that Kahn controlled $1 billion of Prophecy's leveraged capital and that the scheme touched several transactions involving B. Riley.[41]  To conceal losses, Kahn allegedly pledged nearly $200 million in shares of a publicly traded company to a Prophecy affiliate.[42]

The plaintiff here believes that earlier lawsuits in 2020 to 2022 about similar conduct "should have raised red flags to B. Riley and its Board about whether to continue to transact with Kahn."[43]

On a November 8 earnings call, Riley defended Kahn, stating he had "no direct experience with what ha[d] been alleged" and that Kahn's denial of any involvement was "good enough for [Riley]."[44]  Media reports began scrutinizing the close ties between Kahn and B. Riley.[45]  B. Riley soon received subpoenas regarding its relationship with Kahn.[46]

---

[41] *Id.* ¶ 243.

[42] *Id.* ¶ 240.

[43] *Id.* ¶¶ 251, 258.

[44] *Id.* ¶ 253.

[45] *Id.* ¶ 257 (citing Jonathan Weil, *How an Unremarkable Deal Became a Big Threat to a Small Investment Bank*, Wall St. J. (Feb. 12, 2024)); *see also id.* ¶¶ 254-56.

[46] *Id.* ¶¶ 347, 358.

### F. B. Riley's Investigation and FRG's Bankruptcy

On December 18, 2023, the B. Riley Board met to discuss the Prophecy fallout.[47] The Audit Committee—Paulson, D'Agostino, and LaBran—took the lead in designing a review process.[48] The Audit Committee retained the Company's existing outside counsel, Sullivan & Cromwell LLP, to help it assess B. Riley's relationship with Kahn and his associates.[49]

On February 19, 2024, Sullivan & Cromwell reported to the Board that it found no evidence of misconduct by B. Riley personnel or knowledge of the fraudulent activities at Prophecy before the November 2023 take-private announcement.[50] The plaintiff alleges that using pre-existing Company counsel "ensured that [the findings] would exonerate" B. Riley.[51] Nevertheless, B. Riley, with the Board's blessing, issued a press release detailing its findings.[52]

---

[47] *Id.* ¶¶ 275-78; *see also* Outside Defs.' Ex. 3 (B. Riley Board of Director Meeting Minutes, dated Dec. 18, 2023).

[48] Compl. ¶¶ 60-62, 280.

[49] *Id.* ¶ 280.

[50] Nominal Def.'s and Officer Defs.' Ex. 10 (Minutes of Meeting of the Board of Directors of B. Riley Fin., Inc., dated Feb. 19, 2024); *see* Compl. ¶¶ 294-95.

[51] Compl. ¶ 285.

[52] *Id.* ¶¶ 299-300.

Soon after, B. Riley's auditor "expressed concerns about using existing Company counsel . . . for the review."[53]  As a result, the Audit Committee retained an independent law firm, Winston & Strawn LLP, to perform an investigation.[54]  In mid-March, Paulson reported to the Board that Winston & Strawn's investigation was complete and "did not uncover a single badge of fraud" by B. Riley.[55]  B. Riley disclosed these findings in an April 2024 Form 8-K.[56]

The plaintiff questions Winston & Strawn's independence based on prior engagements for B. Riley portfolio companies and a 2019 conference sponsorship.[57]  He also criticizes Paulson's role in leading the investigations as Audit Committee Chair given his involvement in the FRG take-private negotiations.[58]

Meanwhile, FRG's financial performance declined.  In May 2024, B. Riley reported a net loss of $51 million during the first quarter of the year, which it partly attributed to FRG.[59]  FRG filed for bankruptcy in November 2024.[60]  B. Riley

---

[53] *Id.* ¶ 306.

[54] *Id.* ¶ 309; *id.* ¶¶ 308-09; Outside Defs.' Ex. 5 (B. Riley Board of Directors Meeting Minutes, dated Feb. 28, 2024).

[55] Compl. ¶¶ 320, 324.

[56] *Id.* ¶¶ 330-31.

[57] *Id.* ¶¶ 333-34.

[58] *Id.* ¶ 329.

[59] *Id.* ¶¶ 343, 345.

[60] *Id.* ¶ 352.

ultimately took approximately $490 million in write-downs for the failed FRG investment.[61]

## G. The Federal Securities Litigation

In January 2024, B. Riley stockholders filed a securities class action in the United States District Court for the Central District of California.[62] Their complaint alleged that B. Riley, Riley, and Kelleher made materially false and misleading public statements by failing to disclose Kahn's involvement in the Prophecy conspiracy.[63]

In December 2025, the federal court largely denied a motion to dismiss, sustaining certain claims against the Company and Riley.[64]

## H. This Litigation

On February 14, 2025, plaintiff Michael Robert Marchner filed this derivative action after obtaining Company books and records under 8 *Del. C.* § 220.[65] The Complaint advances four counts for breach of fiduciary duty against Riley (Count I), Kelleher (Count II), the Audit Committee (Count III), and the remaining members

---

[61] *Id.* ¶ 353.

[62] *Id.* ¶ 359; *In re B. Riley Fin., Inc. Sec. Litig.*, 2:24-cv-00662-SPG-AJR (C.D. Cal.).

[63] Compl. ¶ 360.

[64] Pl.'s Letter Regarding Suppl. Authority (Dkt. 50) Ex. A.

[65] Dkt. 1; Compl. ¶ 370.

of the Board (Count IV).[66]  The claims allege failed oversight, material misstatements and omissions, corporate waste, and bad faith.[67]

The defendants moved to dismiss the Complaint on May 1, 2025.[68]  After briefing was complete,[69] oral argument was presented on December 11.[70]  The federal court's motion to dismiss ruling prompted the plaintiff to file a supplemental submission on December 17, which the defendants responded to on December 22.[71] The motions to dismiss were then taken under advisement.

## II.  LEGAL ANALYSIS

The defendants moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand excusal and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[72]  The Rule 23.1 motions are

---

[66] Compl. ¶¶ 489-512.

[67] *Id.* ¶¶ 149, 448, 504 (oversight); *id.* ¶¶ 493, 449 (misstatements); *id.* ¶¶ 494, 497, 500, 503, 510 (corporate waste); *id* ¶¶ 416, 491-92, 497-98 (disloyalty or bad faith).

[68] Opening Br. in Supp. of Nominal Def. B. Riley Financial, Inc. and Defs. Bryant R. Riley and Thomas J. Kelleher's Mot. to Dismiss (Dkt. 20) ("B. Riley Defs.' Opening Br."); Outside Director Defs.' Opening Br. in Supp. of Mot. to Dismiss (Dkt. 21) ("Outside Directors Defs.' Opening Br.").

[69] Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss (Dkt. 27) ("Pls.' Answering Br."); Reply Br. in Supp. of Defs.' Mot. to Dismiss (Dkt. 32); Defs.' Reply Br. in Supp. of Mot. to Dismiss (Dkt. 34).

[70] Dkt. 54.

[71] Dkts. 50, 52.

[72] B. Riley Defs.' Opening Br. 17, 52, 63; Outside Directors Defs.' Opening Br. 9, 29.

dispositive.[73] The plaintiff did not make a demand on the Board and has not adequately pleaded that doing so would have been futile.[74]

Under Rule 23.1, a stockholder who files derivative claims must "state with particularity . . . [the] effort[s] by the derivative plaintiff to obtain the desired action from the entity" and "the reasons for not obtaining the action or not making the effort[.]"[75] The plaintiff need not make a demand where doing so would be futile. "Rule 23.1 requires that a plaintiff who asserts demand futility must 'comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Rule 8(a).'"[76]

## A.    Demand Futility

In determining whether a pre-suit demand is futile, the court "is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the

---

[73] *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("[T]he requirement[s] of Chancery Court Rule 23.1 exist[] at the threshold to prevent abuse and to promote intracorporate dispute resolution."), *overruled on other grounds by*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[74] Compl. ¶ 410 (arguing that demand was futile).

[75] Ct. Ch. R. 23.1; *see Brehm*, 746 A.2d at 254 ("Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.").

[76] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) (citation omitted).

Complaint by reference, and facts subject to judicial notice."[77]   The facts are evaluated "in their totality," and all reasonable inferences are drawn in favor of the plaintiff.[78]  The court will reject "conclusory allegations" or "inferences that are not objectively reasonable[.]"[79]

Under *United Food & Commercial Workers Union v. Zuckerberg*, the court must consider:

(i)      whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii)      whether the director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and

(iii)      whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[80]

---

[77] *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *4 (Del. Ch. Dec. 15, 2021) (citing *White v. Panic*, 783 A.2d 543, 546-47 (Del. 2001)), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE).

[78] *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015).

[79] *In re GoPro, Inc.*, 2020 WL 2036602, at *8 (Del. Ch. Apr. 28, 2020).

[80] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1058 (Del. 2021).

This inquiry is done on a "director-by-director" basis.[81] "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[82]

At the time this suit was filed, the Board consisted of the same nine members in place during the relevant events: Riley, Kelleher, Antin, Brandt, D'Agostino, LaBran, Paulson, Sheldon, and Walters.[83] The defendants do not contest the plaintiff's allegations that Riley, Kelleher, and Antin lack independence and disinterestedness for purposes of the demand futility analysis.[84] Thus, to excuse demand, the plaintiff must successfully challenge the impartiality of at least two other Board members.[85] He has not done so.

The first *Zuckerberg* prong, which considers whether a director received a material personal benefit from the alleged misconduct, is not at issue.[86] The plaintiff only makes passing references to compensation received by the directors in the

---

[81] *Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006); *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) (explaining that a plaintiff must "plead facts specific to each director").

[82] *Zuckerberg*, 262 A.3d at 1059.

[83] Compl. ¶¶ 49-64.

[84] B. Riley Defs.' Opening Br. 40 & n.13; Tr. of Oral Arg. on Defs.' Mots. to Dismiss (Dkt. 53) ("Hr'g Tr.") 42.

[85] *Zuckerberg*, 262 A.3d at 1059.

[86] *Id.* The plaintiff also raised the directors' compensation as impugning their independence from Riley, which I address below. *See infra* Section II.A.2.

ordinary course.[87] "[U]nder Delaware law, the receipt of customary directors' fees does not suggest a conflict of interest, the rationale being that, if it did, every director who receives a director's fee would be deemed biased."[88] The plaintiff instead focuses on the second and third *Zuckerberg* prongs.[89] My analysis proceeds accordingly.

As explained below, the plaintiff did not plead particularized facts putting in doubt that five of the six contested directors—Brandt, D'Agostino, LaBran, Sheldon, and Walters—are independent and disinterested. I first evaluate whether those directors face a substantial likelihood of liability under the second *Zuckerberg* prong, before turning to their independence under the third. I conclude that a majority of those five directors could impartially consider a demand and decline to evaluate the independence of the sixth director, Paulson.

### 1. Substantial Likelihood of Liability

The defendants do not contest that Riley, Kelleher, and Antin are disabled for demand futility purposes. Thus, I limit my analysis under the second *Zuckerberg*

---

[87] Compl. ¶¶ 58-64.

[88] *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *10 (Del. Ch. Jan. 10, 2003); *see also Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *14 (Del. Ch. Jan. 14, 2010) (explaining that ordinary course compensation for one's service as a director, "standing alone, cannot be the basis for asserting a lack of independence").

[89] Compl. ¶¶ 36-37, 39-45.

prong to the five outside directors necessary to constitute a Board majority: Brandt, D'Agostino, LaBran, Sheldon, and Walters (the "Demand Majority").

"Directors are unable to impartially consider a demand if they face a substantial likelihood of personal liability on the claims asserted."[90] The plaintiff seeks to meet this burden by claiming that the Demand Majority (1) failed in their duties to oversee B. Riley's business and affairs, and (2) made materially false and misleading disclosures.[91] Because B. Riley's certificate of incorporation exculpates its directors from personal liability under 8 *Del. C.* § 102(b)(7), the plaintiff must

---

[90] *Central Laborers' Pension Fund v. Karp*, 349 A.3d 1165, 1183 (Del. Ch. 2025) (explaining that, to establish a substantial likelihood of liability at the pleading stage, a plaintiff must "make a threshold showing, through the allegation of particularized facts, that their claims ha[ve] some merit" (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993))); *see also Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) ("The [c]ourt . . . in the exercise of its sound discretion must be satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. Only in that context is demand excused.").

[91] The Complaint suggests four theories of non-exculpated liability: breach of the duty of oversight under *Caremark*, the making of material misstatements or omissions, corporate waste, and bad faith. Compl. ¶¶ 448, 504 (*Caremark*); *id.* ¶¶ 493, 499 (misstatements); *id.* ¶¶ 494, 497, 500 (waste); *id.* ¶¶ 416, 491-92, 497-98 (bad faith). At oral argument, however, the plaintiff's counsel clarified that the disclosure theories are "encompassed within *Caremark*," while making no attempt to advance the waste and bad faith theories. Hr'g Tr. 56-57 (The Court: "So your theory of liability for the board on substantial likelihood of liability prong is *Caremark* prong one or *Caremark* prong two? . . . That's it?" Counsel: "Yes."). For completeness, I address both the oversight and disclosure theories on the merits and treat the remaining theories as abandoned or folded into *Caremark*. Regardless, any freestanding waste claim would fail. The challenged transactions—including the FRG take-private and the associated loans—involved substantial consideration and do not represent an exchange "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993).

plead particularized facts supporting a reasonable inference that the Demand Majority acted disloyally or in bad faith.[92]  He has not done so.

### a.    The Oversight Allegations

First, the plaintiff claims that the Demand Majority failed in its duties of oversight.  As Chancellor Allen explained in *Caremark*, this "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[93]  In *Stone v. Ritter*, the Supreme Court identified two "necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations."[94]  "[O]nly a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability."[95]

---

[92] Nominal Def.'s and Officer Defs.' Ex. 3 (Am. and Restated Certificate of Incorporation of B. Riley Financial, Inc.) art. 8(A) (insulating directors from liability "to the fullest extent permitted under Delaware General Corporation Law Section 102(b)(7)"); *see Richardson v. Clark*, 2020 WL 7861335, at *9 (Del. Ch. Dec. 31, 2020).  The effect of the exculpation clause is to shield the director defendants from monetary liability, except for breaches of fiduciary duty taken in bad faith or disloyalty to the corporation.  *See* 8 *Del. C.* § 102(b)(7).

[93] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[94] 911 A.2d 362, 370 (Del. 2006).

[95] *Caremark*, 698 A.2d at 971.

The plaintiff invokes both prongs of *Caremark*.[96] He alleges that the Demand Majority failed to establish adequate controls to monitor the Company's credit and investment risks associated with Kahn and FRG.[97] He also alleges that the directors consciously disregarded "red flags"—specifically, FRG's declining financial projections, public debt downgrades, and the collateralization of Kahn's loans.[98] He contends that this purported lack of oversight allowed B. Riley to suffer massive financial losses when Kahn was later implicated in the fraud at Prophecy.[99]

But the Complaint lacks particularized allegations indicating that any of the Demand Majority directors acted with the bad faith necessary to state an oversight claim.[100] As explained below, the plaintiff impermissibly attempts to equate a bad business outcome with a breach of the duty of loyalty.[101]

---

[96] *See Constr. Indus. Laborers Pension Fund v. Bingle*, 2022 WL 4102492, at *6 (Del. Ch. Sept. 6, 2022) (discussing the two "prongs" of *Caremark*), *aff'd*, 297 A.3d 1083 (Del. 2023) (TABLE).

[97] Compl. ¶¶ 448, 504.

[98] *Id.* ¶ 218.

[99] *Id.* ¶¶ 3, 249.

[100] *Bingle*, 2022 WL 4102492, at *1 ("[T]he lack of oversight pled must be so extreme that it represents a breach of the duty of loyalty. This in turn requires a pleading of scienter, demonstrating bad faith[.]").

[101] *See Stone*, 911 A.2d at 370, 373 (cautioning that a *Caremark* claim cannot lie where a plaintiff, "[w]ith the benefit of hindsight . . . seeks to equate a bad outcome with bad faith").

### i. Caremark *Prong 1*

The first prong of *Caremark* considers whether a board-level reporting and oversight system monitors material corporate risks and legal compliance.[102] "[T]o satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it."[103] Directors may only be held liable when they do not make a good faith "attempt to assure a reasonable information and reporting system exists."[104]

The Complaint acknowledges the existence of functioning oversight mechanisms: an active Audit Committee that met regularly;[105] the engagement of external auditors;[106] and the retention of outside counsel to assist and report to the committee.[107] For B. Riley—a financial services firm—an Audit Committee tasked

---

[102] *See Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019) ("*Caremark* does have a bottom-line requirement that is important: the board must make a good faith effort—*i.e.*, try—to put in place a reasonable board-level system of monitoring and reporting.").

[103] *Id.*

[104] *Caremark*, 698 A.2d at 971.

[105] *See supra* notes 47-55 and accompanying text; Compl. ¶ 447 (quoting the Audit Committee's charter, which charged the Committee with "carry[ing] out its oversight responsibility," "review[ing] the Company's policies with respect to risk assessment and risk management," and "review[ing] and approv[ing] all related party transactions in accordance with the Company's Code of Business Conduct and Ethics").

[106] *See supra* notes 53-54 and accompanying text.

[107] *See supra* notes 49-56 and accompanying text.

with risk assessment and the Board's hiring of financial and legal advisors is the sort of industry-specific compliance approach Delaware law expects.

These oversight mechanisms demonstrate that the Demand Majority did not "utterly fail[] to implement any reporting or information system or controls"—the exacting standard required to plead bad faith.[108] Indeed, a *Caremark* claim of this variety will fail where a plaintiff concedes the existence of an active audit committee, rather than alleging the company lacked one or that it devoted "patently inadequate time to its work."[109] The "existence of [such] board-level systems of monitoring and oversight[,]" including "a relevant committee" and "the board's use of third-party monitors, auditors, or consultants[,]" vitiates the plaintiff's claim.[110] Because the Complaint confirms that the Board employed internal controls and reporting, the plaintiff cannot establish the utter failure of oversight required to support an inference of bad faith.

---

[108] *Stone*, 911 A.2d at 370.

[109] *Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003); *see also Fisher v. Sanborn*, 2021 WL 1197577, at *10-11 (Del. Ch. Mar. 30, 2021) (dismissing a *Caremark* prong one claim where the complaint conceded the existence of audit and risk committees that met regularly).

[110] *Marchand*, 212 A.3d at 823 (explaining that the existence of such levers is commonplace "[i]n decisions dismissing *Caremark* claims"); *see also In re MetLife Inc. Deriv. Litig.*, 2020 WL 4746635, at *13 (Del. Ch. Aug. 17, 2020) (dismissing a plaintiff's claim under *Caremark* prong one because it was "clear from the [c]omplaint that . . . an extensive network of internal controls" existed).

The plaintiff attempts to resuscitate his claim by arguing that the oversight systems were flawed. He highlights an auditor's finding of weakness in the "effectiveness of management's review controls over investment valuations" and in levers to "properly identify and disclose material related party transactions."[111] But allegations that a compliance system was flawed or ineffective do not support an inference that directors utterly failed to monitor, as is mandatory for *Caremark* liability.[112] As *Marchand v. Barnhill* makes clear, "directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources."[113]

The plaintiff has therefore not shown that any of the Demand Majority directors face a substantial likelihood of liability under the first prong of *Caremark*.

ii. Caremark *Prong 2*

The second prong of *Caremark* concerns a board's duty to attend to "obvious and material" signs of non-compliance with positive law that emerge through the reporting system.[114] To state such a claim, a plaintiff must plead that the directors

---

[111] Compl. ¶ 338.

[112] *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *17, *24 (Del. Ch. Dec. 18, 2017) (explaining that "it is not enough to say that the board's response was ineffective[,]" and that "[b]ad results alone do not imply bad faith" (citing *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *17 (Del. Ch. June 26, 2015), *aff'd*, 133 A.3d 971 (Del. 2016) (TABLE))).

[113] *Marchand*, 212 A.3d at 821.

[114] *In re TransUnion Deriv. S'holder Litig.*, 324 A.3d 869, 886-87 (Del. Ch. 2024).

were presented with "red flags related to compliance with law and consciously disregarded" them in bad faith.[115] "Because bad faith is the touchstone for *Caremark* liability, the court's role is not to second-guess a board's response to a red flag. Claims that quibble with the timing or success of corrective action necessarily fail."[116]

The plaintiff alleges that FRG's declining financial projections, debt downgrades, and loan collateralization were "red flags" that the Demand Majority consciously disregarded.[117] His argument fails on multiple fronts.

First, the plaintiff improperly relies on a constructive knowledge theory. The Complaint alleges that the Audit Committee "should have recognized" that the financial projections used to support the take-private were stale, and "should have" known about B. Riley's undisclosed FRG stock ownership and the risky collateralization of Kahn's margin loans.[118] Delaware courts routinely reject constructive knowledge as insufficient to plead bad faith under *Caremark*.[119] A

---

[115] *MetLife*, 2020 WL 4746635, at *14; *see also Stone*, 911 A.2d at 371.

[116] *Clem v. Skinner*, 2024 WL 668523, at *8 (Del. Ch. Feb. 19, 2024).

[117] Compl. ¶ 218.

[118] *Id.* ¶¶ 149, 155, 448.

[119] *E.g.*, *City of Detroit Police & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653, at *24 (Del. Ch. June 30, 2022).

plaintiff must state specific facts showing actual knowledge of misconduct and a conscious failure to act.[120]

Second, the purported "red flags" cannot support a non-exculpated claim. None are "red flags" of unlawful behavior. They are quintessential business risks—regarding credit, debt downgrades, and valuation—that directors of a company like B. Riley weigh when deciding whether to proceed with an investment.[121] The reliance on earlier financial projections to model post-reorganization valuation, or the assumption of debt—even if risky—is far from an illegal ruse.[122] As Chancellor Chandler explained in *In re Citigroup Inc. Shareholder Derivative Litigation*, to impose oversight liability for failure to monitor business risk, which "is fundamentally different" from illegal conduct, would "eviscerate the core protections of the business judgment rule."[123] Directors are free "to pursue risky

---

[120] *See Pettry*, 2021 WL 2644475, at *7.

[121] *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 130-31 (Del. Ch. 2009) (contrasting "business risks" with "red flags" to state a *Caremark* claim (citing *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 776, 797-99 (Del. Ch. 2009), *aff'd sub nom.*, *Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011))); *see In re ProAssurance Corp. S'holder Deriv. Litig.*, 2023 WL 6426294, at *14 (Del. Ch. Oct. 2, 2023) (explaining that evaluating business risk is "the quintessential board function" (citation omitted)).

[122] *See* Compl. ¶ 412.

[123] *Citigroup*, 964 A.2d at 125, 131; *see also ProAssurance*, 2023 WL 6426294, at *14 (dismissing a *Caremark* claim premised on a risky commercial decision, and explaining that imposing oversight duties for business risk would undermine the business judgment rule).

transactions without the specter of being held personally liable if those decisions turn out poorly."[124]

Third, the plaintiff's accusation of conscious disregard is belied by the very conduct described in the Complaint. Even if the Demand Majority's late awareness of the collateralization of Kahn's loans or FRG's declining financials constituted red flags, the Board did not ignore them. For instance, the Board's alleged reliance on stale projections in January 2023 was addressed by April 2023 when it used newer projections to decide how to respond to FRG's counteroffer.[125] When actual evidence of potential illegality—albeit at a different company—emerged regarding Kahn's fraud at Prophecy, the Audit Committee acted swiftly by asking outside counsel at Sullivan & Cromwell to investigate any potential involvement by the Company.[126] And when the Company's auditor requested an independent review, the Audit Committee retained Winston & Strawn to conduct a second investigation.[127] The Board's retention of two separate law firms to investigate B.

---

[124] *Citigroup*, 964 A.2d at 126; *see also Strassburger v. Earley*, 752 A.2d 557, 582 (Del. Ch. 2000) ("The business judgment rule shields directors from liability for good faith business decisions, even those that turn out to be mistaken."); *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *5 (Del. Ch. Apr. 29, 2010) ("The business judgment rule operates to 'protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments.'" (citation omitted)).

[125] *See* Compl. ¶ 131; *see also supra* notes 19-26 and accompanying text.

[126] Compl. ¶¶ 275-80.

[127] *Id.* ¶ 306-09.

Riley's involvement with the problems at FRG negates any reasonable inference of bad faith.[128]

Finally, the plaintiff's claim suffers from a fundamental doctrinal mismatch. The oversight doctrine addresses failures to monitor internal corporate compliance with positive law.[129] But the purported "red flags" and corporate trauma were at Prophecy—a third-party entity.[130] B. Riley's Board members had no duty to monitor the internal compliance of a separate company.[131] The plaintiff's claim is essentially one for negligent due diligence, which would be exculpated. Seeking to impose liability by hindsight for a souring investment does not support a *Caremark* claim.[132]

The plaintiff has therefore not established that the Demand Majority directors face a substantial likelihood of liability under the second prong of *Caremark*.

---

[128] *Id.* ¶¶ 280, 309.

[129] *See Marchand*, 212 A.3d at 821; *Stone*, 911 A.2d at 370.

[130] *See, e.g.*, Compl. ¶¶ 232-47.

[131] *ProAssurance*, 2023 WL 6426294, at *16 ("This hindsight second-guessing of a business decision that turned out poorly cannot reasonably support an inference of bad faith.").

[132] The plaintiff briefly attempts to bolster his claim by arguing that the Board's failure to monitor its investment in FRG after the take-private closed is evidence of bad faith, relying on *IBEW Local Union 481 Defined Contribution Plan & Tr. v. Winborne*. 301 A.3d 596 (Del. Ch. 2023); *see* Pl.'s Answering Br. 40. *Winborne* is inapposite. The court there addressed a board's failure to monitor an internal, related-party transaction purportedly fraught with conflicts of interest. 301 A.3d at 631-32. B. Riley's investment in FRG, by contrast, was an arms-length negotiation with a third party. *See* Compl. ¶ 172. The failure to perfectly monitor an investment that later goes awry is a matter of business judgment, not bad faith.

b. *Disclosures*

The plaintiff next alleges that the directors breached their fiduciary duties concerning "false and misleading statements and omissions" in the Company's public filings and press releases about the FRG take-private and B. Riley's dealings with Kahn.[133] At oral argument, the plaintiff disclaimed pleading this as a separate theory of liability, arguing instead that the disclosures are "encompassed within *Caremark*."[134] This concession is doctrinally fitting. Delaware recognizes no separate "duty of disclosure." Rather, disclosure obligations represent an application of the traditional duties of care and loyalty.[135] To the extent such a freestanding claim were brought, it is not adequately pleaded.

"When the directors disseminate information to stockholders when no stockholder action is sought, the fiduciary duties of care, loyalty and good faith apply. Dissemination of false information could violate one or more of those duties."[136] Because B. Riley's charter contains a Section 102(b)(7) exculpatory provision, the plaintiff must plead that the disclosures were disloyal.[137] This requires

---

[133] Compl. ¶¶ 360-62.

[134] Hr'g Tr. 60.

[135] *See In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 800 (Del. Ch. 2022) ("The duty of disclosure is an 'application of the fiduciary duties of care and loyalty.'").

[136] *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998).

[137] *See supra* note 92 (addressing the exculpation provision).

particularized facts supporting a reasonable inference that the directors acted with scienter—meaning they knowingly or intentionally issued materially false public statements.[138]  The plaintiff, however, alleges that the directors "willfully or recklessly caused or permitted B. Riley to make" the disclosures.[139]  By hedging his allegation with "recklessly"—a state of mind that implicates the duty of care—the plaintiff falls short of pleading disloyalty with particularity.[140]

To the extent the Complaint alleges that the Board "willfully . . . caused" the disclosure of material misstatements, there are no particularized facts pleaded in support.  The Complaint does not say which director made or caused the misleading statements or omissions, or explain any involvement that the Demand Majority had

---

[138] *See Ellis v. Gonzalez*, 2018 WL 3360816, at *7 (Del. Ch. July 10, 2018) (explaining that due to an exculpation provision in the company's charter, the plaintiff could not "establish demand futility based on his disclosure claims unless he 'plead[s] particularized factual allegations that support the inference that the disclosure violation[s] w[ere] made in bad faith, knowingly or intentionally'" (quoting *Citigroup*, 964 A.2d at 132) (emphasis and quotations removed)), *aff'd*, 205 A.3d 821 (Del. 2019) (TABLE).

[139] Compl. ¶¶ 360-61.

[140] *See, e.g.*, *Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *12 n.104 (Del. Ch. Feb. 12, 2009) ("[R]ecklessness by itself only amounts to gross negligence, which is not sufficient to demonstrate the state of mind necessary for finding a breach of the duty of loyalty."), *aff'd*, 977 A.2d 899 (Del. 2009) (TABLE); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008) ("Indeed, the definition [of gross negligence in the corporate breach of fiduciary duty context] is so strict that it imports the concept of recklessness into the gross negligence standard, thus conflating two standards that are distinct when used in the criminal law concept." (citation omitted)).

in the disclosures.[141] It relies instead on impermissible group pleading, lifting vague facts from the securities class action complaint—an action brought against the Company and certain executives, not the outside directors.[142] Absent particularized allegations showing that the individual Demand Majority directors *knew* of Kahn's purported fraud when the statements were made, I cannot reasonably infer scienter.[143]

## 2.    Independence

The third *Zuckerberg* prong considers whether a given director "lacks independence" from a person who received a material personal benefit from the alleged misconduct or faces a substantial likelihood of liability.[144] Directors are presumed to be independent.[145] At the motion to dismiss stage, "a lack of independence turns on 'whether the plaintiffs have pled facts from which the

---

[141] *See* Compl. ¶¶ 360-61 (arguing that the "[d]efendants . . . willfully or recklessly caused or permitted B. Riley to make [various] false and misleading statements and omissions").

[142] *See id.* ¶ 360; *see also Genworth Fin., Inc. Consol Deriv. Litig.*, 2021 WL 4452338, at *22 (Del. Ch. Sept. 29, 2021) (rejecting a claim that accused a board of making misstatements based on impermissible "group pleading").

[143] *See Guttman*, 823 A.2d at 498 (dismissing claims where the complaint was "devoid of particularized allegations of fact demonstrating that the outside directors had actual or constructive notice" of the alleged misconduct); *In re Zimmer Biomet Hldgs., Inc. Deriv. Litig.*, 2021 WL 3779155, at *15 (Del. Ch. Aug. 25, 2021) ("The lack of well-pleaded allegations about the Director Defendants' involvement in the disclosures 'independently preclude[s] a finding of demand futility.'" (quoting *Ellis*, 2018 WL 3360816, at *9)), *aff'd*, 279 A.3d 356 (Del. 2021) (TABLE).

[144] *Zuckerberg*, 262 A.3d at 1059.

[145] *See Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004).

director's ability to act impartially on a matter important to the interested party can be doubted because th[e] director may feel either subject to the interested party's dominion or beholden to that interested party.'"[146]

Bryant Riley is the only defendant to whom the plaintiff alleges any other director owes a compromising allegiance. The plaintiff does not meaningfully allege that Riley received a material personal benefit from the challenged transactions. He instead argues that Riley faces a substantial likelihood of liability for his alleged misconduct.[147] As a result, the independence inquiry focuses on the Demand Majority directors' relationships with Riley.

Notably, the plaintiff's argument is an attenuated one. He contends that the directors would intentionally violate their own fiduciary duties to help Riley protect his friend, Kahn. To the extent this premise is legally viable, the plaintiff must plead facts establishing that the directors are so beholden to Riley that they cannot be viewed as independent of him.

The plaintiff attempts to shortcut this assessment by branding Riley the "*de facto* controller" of B. Riley.[148] With only a 23.8% ownership stake, this is a feeble

---

[146] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (citing *Sanchez*, 124 A.3d at 1023 n.25).

[147] *See* Compl. ¶ 411.

[148] *Id.* ¶ 52.

31

contention under Delaware law.[149]  But even if he theoretically were a controlling stockholder, that label is irrelevant to the demand futility analysis.  The plaintiff's allegations are insufficient to show that five other Board members were dominated by him, indebted to him for their director roles, or dependent upon their Board compensation.[150]

"Under Delaware law, '[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.'"[151]  In assessing independence, "'our law cannot ignore the social nature of humans' or that they are motivated by things other than money, such as 'love, friendship, and collegiality.'"[152]  The court "consider[s] all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and

---

[149] *See In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003) (recognizing that a 35% stockholder could be a controlling stockholder given the likelihood that fewer than 100% of stockholders turn out for a vote); *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (calling *Cysive* "the most aggressive finding" of control); *see also* 8 *Del. C.* § 144(e)(2)(c).

[150] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 67 (Del. Ch. 2015) (providing that whether a person constitutes a controlling stockholder does not "change[] the director-based focus of the demand futility inquiry").

[151] *Id.* at 59 (citing *Aronson*, 473 A.2d at 816).

[152] *Marchand*, 212 A.3d at 818 (citation omitted); *see Beam*, 845 A.2d at 1052 (deeming a non-interested director not independent where she "would be more willing to risk . . . her reputation than risk the relationship with the interested [person]").

draw all reasonable inferences from the totality of those facts in favor of the plaintiffs."[153]

I consider the independence of the five Demand Majority directors from Riley: Brandt, Walters, Sheldon, D'Agostino, and LaBran.[154] The plaintiff has not pleaded particularized facts showing that these individuals were so conflicted by their ties to Riley that they were unable to impartially consider a demand to pursue the claims in this action.

### a. LaBran

The plaintiff makes no meaningful attempt to satisfy the pleading standard regarding LaBran's independence. At oral argument, plaintiff's counsel effectively conceded the point.[155] Doing so was logical given the limited facts about LaBran.

The Complaint lacks any particularized allegations that put LaBran's independence in doubt. It states only that she received $400,632 for her Board service and that her role on the Audit Committee would cause her to "implicate

---

[153] *Sanchez*, 124 A.3d at 1019.

[154] Compl. ¶¶ 422-88. As noted above, the defendants concede that the independence of Kelleher and Antin are not meaningfully in play. *See supra* notes 84-85 and accompanying text.

[155] Hr'g Tr. 59.

herself" by considering a demand.[156] Taken together with the most generous of inferences, these facts fall short.

There is no allegation that Riley is responsible for LaBran receiving director compensation. Nor does the plaintiff allege that these ordinary course payments were material to her such that her independence would be put in doubt. "Delaware law recognizes that directors will be paid a fair and reasonable amount."[157] The conclusory assertion that a director would have to sue herself to bring a claim is also insufficient to excuse demand.[158]

### b. Sheldon

The plaintiff challenges Michael Sheldon's independence from Riley based on ordinary course director compensation of $627,812, his status as a "Facebook friend" of Riley, his disclosure of their friendship on a D&O questionnaire, and the fact that the two served together on the board of Aldila, Inc. fifteen years ago.[159]

These allegations fall short of overcoming the presumption of independence. As with LaBran, the plaintiff does not plead that Sheldon's director compensation

---

[156] Compl. ¶¶ 446-52.

[157] *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *15 (Del. Ch. Jan. 21, 2022).

[158] *See Citigroup*, 964 A.2d at 121 ("Demand is not excused solely because the directors would be deciding to sue themselves."); *Aronson*, 473 A.2d at 815 (explaining that "the mere threat of personal liability . . . is insufficient to challenge either the independence or disinterestedness of directors").

[159] Compl. ¶¶ 479-80.

was material to him.[160] The remaining allegations amount to nothing more than "thin social-circle friendship" allegations, which Delaware courts routinely reject as insufficient to show that a director's discretion is sterilized.[161] Acknowledging a friendship on a routine compliance questionnaire does not elevate the relationship to a bias-producing one. Past service on an outside board that ended more than a decade ago does not render Sheldon beholden to Riley today.[162]

### c. Walters

The plaintiff questions the independence of Miriam Walters based on her service on the board of Eos Energy Enterprises, Inc., her receipt of director compensation, and her role on B. Riley's ESG Committee.[163] None of these facts overcome the presumption of independence.

First, the plaintiff theorizes that Walters would not have been appointed to the Eos board "but for" Riley, and that her failure to resign amid a lawsuit regarding an

---

[160] *See Simons*, 2022 WL 223464, at *15.

[161] *Sanchez*, 124 A.3d at 1022; *see also Beam*, 845 A.2d at 1051-52 ("Mere allegations that [directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes.").

[162] *See Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (rejecting "conclusory allegations" that the directors were dominated by the interested party because they served together on boards of unaffiliated companies as insufficient to support a reasonable inference that the directors lacked independence).

[163] Compl. ¶ 467.

35

Eos de-SPAC transaction shows she "acquiesced" to him.[164]  But being appointed by a person does not, without more, create a sense of owingness that destroys independence.[165]  Nor does a director's purported acquiescence to the actions of another director support an inference of domination.[166]

The plaintiff next points to the roughly $1.3 million Walters received for serving on the Eos and B. Riley boards.[167]  "[D]irector compensation alone cannot create a reasonable basis to doubt a director's impartiality."[168]  Because the plaintiff has not pleaded particularized facts demonstrating that these fees were financially material to Walters, the allegations are insufficient.[169]

Finally, the plaintiff critiques Walters' membership on the ESG Committee, claiming that she rubber-stamped Riley's friends and business associates for Board

---

[164] *Id.* ¶¶ 467, 473-75.

[165] *See In re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *18 (Del. Ch. Jan. 31, 2022) ("[T]he 'mere fact that one was appointed by a[n alleged] controller' does not . . . overcome the presumption of director independence." (citation omitted)), *aff'd*, 285 A.3d 1204 (Del. 2022) (TABLE).

[166] *See In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009) ("That directors acquiesce in, or endorse actions by, a chairman of the board . . . does not, without more, support an inference of domination by the chairman or the absence of directorial will.").

[167] Compl. ¶¶ 471, 477.

[168] *Robotti & Co.*, 2010 WL 157474, at *15.

[169] *See id.*; *see also Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *23 (Del. Ch. Mar. 26, 2018).

36

appointments.[170]    This is bare speculation on motives, which cannot excuse demand.[171] Appointing individuals from within one's professional or social network does not suggest a lack of independence.[172]

### d.    Brandt

The plaintiff attempts to classify Tamara Brandt as a "de facto" employee of B. Riley because she served as the Chief Legal Officer of FaZeClan—a company that merged with a B. Riley affiliate in 2022 to form FaZe Holdings.[173] The plaintiff argues that Brandt's compensation from FaZe Holdings was effectively paid by B. Riley, making her indebted to Riley and stripping her of independence under NASDAQ rules.[174]

---

[170] Compl. ¶¶ 451-52, 477-78 (arguing that Walters acquiesced to Riley by "consistently nominat[ing]" his "friends and business associates" to the board, even though "thousands of [] qualified" individuals could have done so).

[171] *Tilden v. Cunningham*, 2018 WL 5307706, at *12 (Del. Ch. Oct. 26, 2018) ("Speculation on motives for undertaking corporate action [is] wholly insufficient to establish a case of demand excusal.").

[172] *See Beam*, 845 A.2d at 1052.

[173] Compl. ¶¶ 453-58.

[174] *Id.* ¶ 463 (arguing that Brandt's status as a "de facto employee" violates NASDAQ's definition of director independence); *id.* ¶ 465 (indicating that $3 million worth of payments to Brandt, from the post-merger company, were instead made by B. Riley).

These allegations ignore basic principles of corporate separateness.[175] Brandt was an executive of FaZe Holdings, not B. Riley.[176] The Complaint relies on the fact that a B. Riley affiliate held a minority stake in FaZe Holdings.[177] But the plaintiff pleads no facts suggesting that B. Riley—let alone Bryant Riley personally—controlled FaZe Holdings, dictated Brandt's employment, or set her salary. Nor does the Complaint allege that Brandt assumed or discharged the duties of an office at B. Riley, which is required to establish "de facto" employee status.[178] Even if the plaintiff had established that B. Riley influenced Brandt's compensation at FaZe Holdings, the claim would fail because he does not allege that the compensation was material to her.[179]

---

[175] *See Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) ("[O]ur corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control."); *see also In re Aearo Techs., LLC*, 346 A.3d 584, 596 n.77 (Del. 2025).

[176] Nor has the plaintiff suggested that such payments were material to Brandt. *Carr*, 2018 WL 1472336, at *23.

[177] Compl. ¶¶ 462-63.

[178] *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 48 (Del. 2006) (defining a "de facto officer" as "one who actually assumes possession of an office . . . and who is actually discharging the duties of that office, but for some legal reason lacks *de jure* legal title to that office").

[179] *See In re Ltd., Inc.*, 2002 WL 537692, at *4 (Del. Ch. Mar. 27, 2002) (finding standard director compensation insufficient to excuse demand); *Carr*, 2018 WL 1472336, at *23 (holding that the plaintiff had not pleaded "facts such that it would be reasonable to infer that [the directors' total compensation] . . . w[as] material to them so as to taint their decision-making").

e.      *D'Agostino*

Robert D'Agostino joined the Board in 2015 and serves on the Audit Committee.[180]  The plaintiff alleges that he lacks independence based on his 20-year personal and professional relationship with Riley.[181]  The Complaint notes that the two attended Lehigh University, belonged to the same fraternity, and "meet socially," as acknowledged in a D&O questionnaire.[182]  The plaintiff also cites D'Agostino's receipt of $665,896 in ordinary course director compensation, his past service on other boards with Riley, and B. Riley's role as the exclusive financial advisor to Q-Mation, Inc., where D'Agostino serves as President.[183]

These allegations of a "longstanding . . . professional and personal relationship" are insufficient to defeat independence.[184]  As the Supreme Court noted in *Beam v. Stewart*, "[m]ere allegations that [directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to

---

[180] Compl. ¶ 60.

[181] *Id.* ¶¶ 438-40.

[182] *Id.* ¶¶ 438-39.

[183] *Id.* ¶¶ 433-34, 441.

[184] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 980-81 (Del. Ch. 2000) (holding that an allegation of "long-standing 15-year professional and personal relationship" was insufficient to defeat independence); *Benerofe v. Cha*, 1998 WL 83081, at *2-3 (Del. Ch. Feb. 20, 1998) (concluding that an "allegation that [a director] is a long-time friend of [the interested party], without more, fails to raise a reasonable doubt that [the director] would be able to exercise independent judgment").

negate a director's independence[.]"[185]  Going to the same college two decades ago, shared fraternity membership, and casual social meetings do not suggest the type of bias-producing relationship that would sterilize a director's discretion.[186]  Similarly, past service on outside boards or being nominated by an interested party does not impugn a director's current independence.[187]

The plaintiff's financial allegations fare no better.  The assertion regarding Q-Mation is illogical: if B. Riley served as the financial advisor to D'Agostino's company, the reasonable inference is that B. Riley was beholden to D'Agostino for

---

[185] *Beam*, 845 A.2d at 1051-52; *see also Sandys*, 152 A.3d at 130 (explaining that a casual social friendship is not "suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment").

[186] *See Cal. Pub. Empls.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *7, *9 (Del. Ch. Dec. 18, 2002) (noting that "personal friendships," such as being "lifelong friends" with an interested party, are, without more, "insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment"); *Teamsters Loc. 237 Additional Sec. Benefit Fund v. Caruso*, 2021 WL 3883932, at *18 (Del. Ch. Aug. 31, 2021) (rejecting "thin social-circle friendship allegations" that directors "are members of the same country club" and "in social proximity" as insufficient to support a lack of independence); *Jacobs v. Yang*, 2004 WL 1728521, at *7 (Del. Ch. Aug. 2, 2004) (observing "it is well settled that social and business ties alone do not give rise to a lack of independence"), *aff'd*, 867 A.2d 902 (Del. 2005) (TABLE); *In re BGC P'rs, Inc. Deriv. Litig.*, 2021 WL 4271788, at *7 (Del. Ch. Sept. 20, 2021) (holding that a director's past ties to a college where the interested party was a major donor did not compromise her independence).

[187] *See Singer*, 2006 WL 741939, at *5 (rejecting "conclusory allegations" that the directors were dominated by the interested party because they served together on boards of unaffiliated companies).

the engagement, not the reverse.[188]  Finally, as with the other directors, the plaintiff has not pleaded particularized facts demonstrating that D'Agostino's ordinary course director fees were material to him.[189]

*     *     *

The Complaint lacks particularized facts showing that five of the nine Board members—Brandt, Walters, Sheldon, D'Agostino, and LaBran—face a substantial likelihood of liability or lack independence.  Demand is therefore not excused under Rule 23.1.  I decline to address the remaining four directors.

## B.    Failure to State a Claim

The defendants also argue that the plaintiff's claims should be dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim.[190]  Because demand is not excused under Rule 23.1, the Board retains control over this litigation asset.  I need not conduct a further analysis of the merits.[191]

---

[188] See B. Riley Defs.' Opening Br. 50.

[189] *E.g.*, *Simons*, 2022 WL 223464, at *15 ("Delaware law recognizes that directors will be paid a fair and reasonable amount. For that reason, when director fees are not excessive, mere allegations of payment of director fees are insufficient to create a reasonable doubt as to the director's independence.").

[190] B. Riley Defs.' Opening Br. 52.

[191] *See, e.g.*, *Harrison Metal Cap. III, L.P. v. Mathé*, 2024 WL 1299579, at *6 (Del. Ch. Mar. 27, 2024) ("The court concludes that the [complaint] must be dismissed under Rule 23.1 for failure to plead demand futility, and, therefore, does not reach the Rule 12(b)(6) argument."); *Karp*, 349 A.3d at 1182 (describing the "Rule 23.1 motion" as "dispositive").

## III.  CONCLUSION

For the above reasons, the defendants' motions to dismiss are granted under Court of Chancery Rule 23.1.  The Complaint is dismissed in full.